**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____

**RICHARD WILSON,**                           :
        **Plaintiff,**                    :      **CIVIL ACTION**
    **v.**                                    :
                           :      **NO. 09-2961**

**MARGARET BURKE, M.D., _et al._,**           :
        **Defendants.**                   :
_____:

### MEMORANDUM OPINION AND ORDER

**RUFE, J.**                                                    **September 18, 2012**

Plaintiff Richard Wilson was committed to the custody of the Curran-Fromhold

Correctional Facility ("CFCF") on July 25, 2008, just days after having suffered multiple gunshot

wounds.  In this civil rights action, filed pursuant to 42 U.S.C. § 1983, Plaintiff asserts that

Defendants Dr. Margaret Burke and Dr. Alyn Caulk ("Medical Defendants") were deliberately

indifferent to his serious medical needs when they failed to follow the course of treatment that

had been prescribed by a specialist before Plaintiff was admitted to the facility (Count I).  He also

asserts an excessive force claim against Defendant Sergeant Michael Brown for injuries caused

when Defendant Brown pushed Plaintiff up two flights of stairs (Count II).  Plaintiff seeks to

hold Defendant the City of Philadelphia ("the City") liable for the acts of both Medical

Defendants and Defendant Brown.

Before the Court are three Motions for Summary Judgment: two filed by Medical

Defendants[1] and one filed by Defendant Brown and the City (collectively, "City Defendants").[2] Because the Court finds that Plaintiff has failed to exhaust his administrative remedies, has failed to establish municipal liability as to the City, and has failed to produce evidence from which a jury could conclude that Medical Defendants were deliberately indifferent to his medical needs or that the force applied by Defendant Brown was excessive, the Motions will be granted.

## I. FACTUAL BACKGROUND

On July 21, 2008, Plaintiff Richard Wilson was admitted to the Hospital of the University of Pennsylvania ("HUP") in Philadelphia for treatment of injuries resulting from several gunshot wounds.[3] Two days later he was transferred to Presbyterian Hospital, also in Philadelphia, for additional treatment, including surgery on his abdomen, right arm, and right hip.[4] During surgery on Plaintiff's right arm, doctors inserted various plates and pins to facilitate healing of the bone, which had been shattered.[5]

According to Plaintiff, a doctor at either HUP or Presbyterian provided prison officials a recommended course of treatment, including prescribed medications, and advised that Plaintiff

---

[1] Doc. Nos. 63, 75.  The first motion was filed by Defendants Dr. Burke, Dr. Caulk, and Defendant John Oliver.  After the motion was filed, Defendant Oliver was dismissed by stipulation signed by the parties.  (See Doc. Nos. 58, 65.)

[2] Doc. No. 81.  This motion was filed by Defendant Brown and Defendant Philadelphia Prison Systems ("PPS").  However, after the motion was filed the parties stipulated that Defendant PPS be substituted by the City of Philadelphia and that the caption be amended to reflect the same.  (See Doc. No. 86.)  All references in the Second Amended Complaint and other pleadings, motion papers, and discovery to PPS are read to be asserted against or by, and directed to or by, the City of Philadelphia pursuant to this stipulation and order.  Accordingly, the Court refers to the City only throughout.

[3] Second Am. Compl. ("SAC") ¶ 13; Pl.'s Depo. 27:21-23.

[4] SAC ¶¶ 14-15; Pl.'s Depo. 28:12-14.

[5] SAC ¶ 16.

be seen by a specialist.[6]  During his deposition, Plaintiff testified that he did not have a copy of,

nor had he seen, this recommendation, but maintained that the doctors who treated him between

July 21 and 25, 2008, advised that he return to the hospital to see a specialist following his

surgery.  Plaintiff's medical records contain written discharge instructions which prescribe that

Plaintiff be given medicine for pain and vitamins and other supplements to promote recovery,

instructs that his arm be kept dry and not bear any weight, and provides that Plaintiff should

follow up with a doctor in one week.[7]

**A.      Plaintiff's Medical Treatment While Incarcerated**

On July 25, 2008, Plaintiff was released from Presbyterian Hospital into the custody of

two Philadelphia police officers who took Plaintiff to the CFCF where Plaintiff was processed

for incarceration.[8]  As part of this inmate processing, Plaintiff was evaluated by a registered

nurse.[9]  Plaintiff claims that within a few days of his admission to the facility, he complained to

prison staff about increasing pain in his arm.[10]  A day or two after arriving at CFCF, Plaintiff was

seen by a doctor and a nurse; he does not remember what happened during this exam, and cannot

remember whether the doctor explained the nature of his injury.[11]  During his deposition,

---

[6]  SAC ¶¶ 25, 27.

[7]  Doc. No. 75-3 at 8-9, Doc. No. 82-1 at 1-11.

[8]  SAC ¶¶ 17, 19; Pl.'s Depo. 29:23-30:3; 35:6-36:4.

[9]  Pl.'s Depo. 36:7-14; Doc. No. 75-3 at 17.  This examination was conducted by John Oliver, a former
Defendant in this case, who was dismissed by stipulation of the parties because, in Plaintiff's words, "no claim could
be stated against him." Pl.'s Depo. 36:15-22; Doc. Nos. 58, 65.

[10]  SAC ¶ 24.

[11]  Pl.'s Depo. 36:23-38.19; Doc. No. 75-3 at 17.

Plaintiff was unable to recall exactly how many times he was seen by Defendant Doctors Alan Caulk and Margaret Burke, but stated that he was "treated, the overwhelming majority of the time, by Dr. Caulk and Dr. Burke as related to [his] arm," and that he was seen by Dr. Caulk over a period of five to six months.[12]

Dr. Caulk, who worked as a chronic care specialist at CFCF, met with Plaintiff on one or more occasions to explain that x-rays revealed several fragments in his shoulder and that she was going to perform surgery to remove the fragments.[13]  In response, Plaintiff stated that he wanted to be seen by an orthopedist or another specialist, or to be sent back to HUP for the surgery; he refused to authorize Dr. Caulk to perform the surgery.[14]  According to Plaintiff, when he asked why he could not be taken to a specialist, Dr. Caulk said "something to do with the budget, funding, then transportation, and the most vivid conversation I had with her she stated, basically, to me that, this type of surgery, I could do this here and remove the chips on my own.[15]

It appears that Dr. Caulk left CFCF in December 2008, and about a month later, Dr. Burke began working there as a chronic care specialist.[16]  Although Plaintiff does not remember having a specific conversation with Dr. Burke about attending physical therapy for his arm, since he attended physical therapy, "then apparently, I would have had to have a conversation with her

---

[12]  Pl.'s Depo. 45:12-46:15.

[13]  Pl.'s Depo. 54-57.

[14]  Pl.'s Depo. 57:14-58:5.

[15]  Pl.'s Depo. 55:3-55:14.

[16]  Pl.'s Depo. 58-60.

about being able to exercise and do some therapy."[17]  Plaintiff attended a physical therapy session

in the summer of 2009 at the Federal Detention Center in Philadelphia, but refused to return for

any additional sessions because he found it too painful.[18]

On February 8, 2009, Plaintiff filed an inmate grievance, claiming that he "received

inadequate medical attention for his injuries," and requesting relief in the form of his being seen

by an orthopedist immediately.[19]  It is unclear what the initial disposition of this grievance was,

but neither party has submitted any evidence that this grievance was resolved and Plaintiff has

not shown that he took any steps to redress the alleged inadequate medical treatment beyond the

filing of the initial grievance.

In the Second Amended Complaint, Plaintiff claims that Dr. Caulk and Dr. Burke

ignored the course of treatment provided in discharge instructions and that their failure to follow

this course of treatment rises to the level of deliberate indifference (Count I).  Plaintiff submits

that the City is liable for Medical Defendants' deliberate indifference because Dr. Caulk's

comment that Plaintiff could not see a specialist because of "something to do with the budget,

funding, then transportation," evidences a prison policy which resulted in the denial of treatment

here.[20]

**B.     Plaintiff's Altercation with Defendant Sergeant Michael Brown**

On May 12, 2009, nearly 10 months after he arrived at CFCF, prison officials transferred

---

[17]  Pl.'s Depo. 71:6-8.

[18]  Pl.'s Depo. 65-68.

[19]  Doc. No. 85-1 at 23.

[20]  Pl.'s Depo. 55:1-14; Pl.'s Br. in Opp'n to City Defs.' Mot. Summ. J. at 7.

Plaintiff from Cell 13 of Unit C1, Pod 1 to Cell 23 of this same unit.[21]  Cell 13, which is on the first tier of the unit, and Cell 23, which is on the second tier of the unit, are separated by a staircase with a short flight of stairs, a landing, and then a longer flight of stairs.[22]  Before Plaintiff was transferred, Correctional Officer Dominic Ninan approached Plaintiff, who was in Cell 13, and asked Plaintiff for his bunk status; Plaintiff responded, "bottom bunk and bottom tier."[23]  Officer Ninan then left, returning 35 to 40 minutes later, and asked Plaintiff to produce his bunk designation card.[24]  Another 25 minutes passed before Officer Ninan returned with Defendant Sergeant Michael Brown.[25]

Defendant Brown asked Plaintiff why he was not packed; Plaintiff answered, "nobody told me to pack."[26]  At his deposition, Plaintiff testified that Defendant Brown responded with dismissive profanity, ordered Plaintiff to turn around, and handcuffed Plaintiff with his hands behind his back.[27]  Defendant Brown then began pushing Plaintiff up the first short flight of stairs to Cell 23, bumping Plaintiff's arm, injured shoulder, and side against the railing.[28]  Defendant Brown then began pushing Plaintiff up the second, longer fight of stairs, "repeatedly" pushing

---

[21]  Defs.' Concise Statement of Stipulated Material Facts ¶ 2; see generally Pl.'s Depo. 94-100.

[22]  Defs.' Concise Statement of Stipulated Material Facts ¶¶ 3-4.

[23]  Pl.'s Depo. 88:4-90:3.

[24]  Pl.'s Depo. 90:8-90:17.

[25]  Pl.'s Depo. 90:19-23.

[26]  Defs.' Concise Statement of Stipulated Material Facts ¶¶ 5-6; Pl.'s Depo. 91:23-92:4.

[27]  Defs.' Concise Statement of Stipulated Material Facts ¶¶ 7-8; Pl.'s Depo. 92:7-92:15.

[28]  Defs.' Concise Statement of Stipulated Material Facts ¶¶ 9-11; Pl.'s Depo. 93:14-22; 94:12-96:23.

Plaintiff's arm, shoulder, and side against the wall.[29]  According to Plaintiff, during this interaction, Plaintiff's shoulder made contact with the railing once, and the wall 3-4 times, but he never fell due to the force used by Defendant Brown.[30]

Plaintiff made several Sick Call Requests over the next few days complaining of pain in his shoulder, wrist, forearm, and hip.[31]  Plaintiff testified at his deposition that the day following the incident, x-rays showed injury to his rotator cuff.[32]  Plaintiff's prison medical file contains an entry, which appears to be dated May 15, 2009,[33] noting that Plaintiff was seen by a triage nurse after he complained about injury sustained to his arm, shoulder, and hip two days prior.[34]  The nurse notes that Plaintiff had no abrasions or swelling, and minimal tenderness of his shoulder without deformity.[35]

On May 13, 2009, Plaintiff submitted a grievance regarding his confrontation with Defendant Brown.[36]  Plaintiff's inmate grievance record provides the status of this grievance as

---

[29]  Defs.' Concise Statement of Stipulated Material Facts ¶¶ 12-13; Pl.'s Depo. 98:9-98:23; 104:13-18.

[30]  See Defs.' Concise Statement of Stipulated Material Facts ¶¶ 14-15; Pl.'s Depo. 94:17-96:10.

[31]  Pl.'s Br. in Opp'n to City Defs.' Mot. Summ. J., Ex. C, Doc. No. 85-1 at 14-17.

[32]  Pl.'s Depo. 103:17-24.

[33]  The date is written in number form and the number of the month is not clearly written.  However, the entry references pain arising from an incident which occurred two days earlier during which Plaintiff's arms were forced behind his back and he was pushed up flight of stairs, and Plaintiff testified that he was seen by medical staff a few days after the incident.  Thus, it appears that the date is May 15, 2009.

[34]  See Pl.'s Br. in Opp'n to City Defs.' Mot. Summ. J., Ex. C, Doc. No. 85-1 at 19-20.

[35]  Id.

[36]  Doc. No. 85-1 at 24.

"unresolved."[37]  Plaintiff did not file any additional grievances regarding this incident or file a

level two appeal.  However, Plaintiff wrote a letter complaint to a "Scott King" of Prison Health

Services in Tennessee.

In the Second Amended Complaint, Plaintiff claims that Defendant Brown used excessive

force in violation of the Eighth Amendment to the United States Constitution when he pushed

him up the stairs on May 12, 2009 (Count II).  He maintains that Defendant Brown disregarded

the "obvious injury" to his right arm, which, according to Plaintiff, was evident from Plaintiff's

bunk status designation.  He alleges that this excessive force is attributable to the City because

the City "did not establish any procedures which would have allowed Defendant Brown to verify

[Plaintiff's] bunk status prior to Defendant Brown's use of force . . . ."[38]

## II. STANDARD OF REVIEW

Upon motion of a party, summary judgment is appropriate if "the materials in the record"

show "that there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law."[39]  Summary judgment may be granted only if the moving party

persuades the district court that "there exists no genuine issue of material fact that would permit a

reasonable jury to find for the nonmoving party."[40]  A fact is "material" if it could affect the

outcome of the suit, given the applicable substantive law.[41]  A dispute about a material fact is

---

[37]  Doc. No. 89-6.

[38]  Pl.'s Br. in Opp'n to City Defs.' Mot. Summ. J. at 3, 9.

[39]  Fed. R. Civ. P. 56(a), (c)(1).

[40]  Miller v. Ind. Hosp., 843 F.2d 139, 143 (3d Cir. 1988).

[41]  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

"genuine" if the evidence presented "is such that a reasonable jury could return a verdict for the nonmoving party."[42]

In evaluating a summary judgment motion, a court "must view the facts in the light most favorable to the non-moving party," and make every reasonable inference in that party's favor.[43] Further, a court may not weigh the evidence or make credibility determinations.[44]  Nevertheless, the party opposing summary judgment must support each essential element of the opposition with concrete evidence in the record.[45]  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."[46]  This requirement upholds the "underlying purpose of summary judgment [which] is to avoid a pointless trial in cases where it is unnecessary and would only cause delay and expense."[47]  Therefore, if, after making all reasonable inferences in favor of the non-moving party, the court determines that there is no genuine dispute as to any material fact, summary judgment is appropriate.[48]

### III. DISCUSSION

#### A.    Preliminary Matters

Plaintiff asserts that Medical Defendants' Answer to the Second Amended Complaint

---

[42]  Id.

[43]  Hugh v. Butler County Family YMCA, 418 F.3d 265, 267 (3d Cir. 2005).

[44]  Boyle v. County of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998).

[45]  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

[46]  Anderson, 477 U.S. at 249-50 (citations omitted).

[47]  Walden v. Saint Gobain Corp., 323 F. Supp. 2d 637, 641 (E.D. Pa. 2004) (citing Goodman v. Mead Johnson & Co., 534 F.2d 566, 573 (3d Cir. 1976)).

[48]  Celotex, 477 U.S. at 322; Wisniewski v. Johns–Manville Corp., 812 F.2d 81, 83 (3d Cir. 1987).

was not timely filed and therefore, the facts as alleged in the Second Amended Complaint are deemed admitted.  Because Plaintiff alleges in the Second Amended Complaint that he exhausted his administrative remedies, Plaintiff reasons that "Medical Defendants cannot be entitled to summary judgment on the exhaustion of administrative remedies."[49]  The Court finds, however, that this argument misconstrues the purpose and scope of Federal Rule of Civil Procedure 8(b)(6), and will not deem admitted the facts contained in the Second Amended Complaint.

Federal Rule of Civil Procedure 8(b)(6)[50] pertains to the failure to deny a specific allegation or allegations and the effect of such failure.  Plaintiff, however, is not asking for specific admissions based on Medical Defendants' failure to specifically deny an allegation; rather, Plaintiff is, in essence, requesting that the Court find Medical Defendants in default, strike their Answer as a result, and deem all facts in the Second Amended Complaint admitted for the purpose of the Motion.  This, the Court will not do.

While the Court denied Medical Defendants' Motion to Dismiss the Second Amended Complaint as untimely, their Answer to the Second Amended Complaint was timely filed—within 14 days after notice of the Court's action on the Motion.[51]  Further, even if the answer were untimely, Plaintiff has failed to show that he was prejudiced in any way by the delay

---

[49]  Doc. No. 72 at 7.

[50]  Rule 8(b)(6) provides: "An allegation—other than one relating to the amount of damages—is admitted if a responsive pleading is required and the allegation is not denied.  If a responsive pleading is not required, an allegation is considered denied or avoided."

[51]  See Fed. R. Civ. P. 12(a)(4)(B).  Rule 12 provides that "[u]nless the court sets a different time, serving a motion under [Rule 12] alters [the time to serve a responsive pleading] as follows: (A) if the court denies the motion or postpones its disposition until trial, the responsive pleading must be served within 14 days after notice of the court's action . . . ."  Here, the Court denied the Motion to Dismiss the Second Amended Complaint as untimely on April 3, 2012.  (See Doc. No. 69)  Accordingly, Medical Defendants' answer was due by April 17, 2012. Their Answer was filed before this deadline and was therefore timely.

and a finding of default here would be at odds with the Federal Rules of Civil Procedure, under which  "pleading is a vehicle 'to facilitate a proper decision on the merit' and not 'a game of skill in which one misstep by counsel may be decisive . . . .'"[52]

Additionally, the Prison Litigation Reform Act, which applies to suits by prisoners under 42 U.S.C. § 1983, provides in pertinent part:

> (g) Waiver of reply
>
> (1) Any defendant may waive the right to reply to any action brought by a prisoner confined in any jail, prison, or other correctional facility under section 1983 of this title or any other Federal law. *Notwithstanding any other law or rule of procedure, such waiver shall not constitute an admission of the allegations contained in the complaint.* No relief shall be granted to the plaintiff unless a reply has been filed.
>
> (2) The court may require any defendant to reply to a complaint brought under this section if it finds that the plaintiff has a reasonable opportunity to prevail on the merits.[53]

 The plain language of this provision appears to preclude a finding that the failure to file an answer in a case such as this constitutes an admission of the allegations contained in that complaint.  While the Third Circuit has not interpreted this provision, district courts throughout this Circuit and others have similarly interpreted § 1997e(g).[54]  The facts as contained in the Second Amended Complaint shall not be deemed admitted.

---

[52] LaGorga v. Kroger Co., 407 F.2d 671, 673 (3d Cir. 1969) (citing United States v. Hougham, 364 U.S. 310, 317 (1960)).

[53] 42 U.S.C. § 1997e(g) (emphasis added).

[54] See, e.g., Wheeler v. Prison Health Servs., Inc., No. 09-410 (Shapiro, J.) (Doc. No. 52) (E.D. Pa. Mar. 24, 2011); Thomas v. Lawler, No. 10-2437, 2012 WL 2367173, at *2 (M.D. Pa. June 21, 2012) (collecting cases).

**B.      Exhaustion**

The Prison Litigation Reform Act of 1995 ("PLRA")[55] was enacted "in the wake of a sharp rise in prisoner litigation in the federal courts."[56]  "A centerpiece of the PLRA's effort "to reduce the quantity . . . of prisoner suits" is an 'invigorated' exhaustion provision, § 1997e(a),"[57] which provides:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

Under § 1997e(a), exhaustion is mandatory.[58]  Prisoners must exhaust all "available" remedies before filing suit challenging any prison condition.[59]  "The PLRA exhaustion requirement requires <u>proper</u> exhaustion."[60]

Philadelphia Prison System Policy includes an internal inmate grievance process available to inmates who seek redress for an injury sustained while incarcerated.[61]  These grievance procedures are available to address any element of prison conditions which the inmate alleges violated their constitutional rights; this includes alleged assaults by prison staff and the denial or

---

[55]  42 U.S.C. § 1997e *et seq.*

[56]  Woodford v. Ngo, 548 U.S. 81, 84 (2006).

[57]  Id. (quoting Porter v. Nussle, 534 U.S. 516, 524 (2002)).

[58]  Id. at 85.

[59]  Id.

[60]  Id. at 93 (emphasis added).

[61]  Philadelphia Prisons Policies & Procedures, Policy 3.F.10 (Policy 3.F.10), Doc. No. 89-1.

inadequacy of medical treatment.[62]  Grievance procedures provide two levels of review.  At level

one, the deputy warden records the grievance and, in the case of a standard grievance, makes a

recommendation to either reject or resolve the grievance within 14 days of receipt; in the case of

a medical grievance, the facility's Health Service Administrator ("HSA") makes the initial

determination as to how to resolve the grievance.[63]  Level one concludes with the Warden's

review and decision, which occurs within 14 days of receipt of the HSA's or Deputy Warden's

recommendation.[64]

Within five days after receipt of the Warden's finding, an inmate unsatisfied with the

finding may appeal to the Commissioner who, within 21 days, makes a final determination; this

is level two of the grievance procedure.[65]  Prison policy also provides that "[e]xpiration of a time

limit at any stage of the process shall entitle the grievant to move to the next level of the

process . . . ."[66]

Plaintiff maintains that "[b]y failing to respond to any of his grievance submissions,

prison officials effectively removed [Plaintiff's] ability to take part in the grievance process," and

that this deprivation resulted in no further remedies being "available" to him.[67]  However, this

contention is belied by prison policy, which provides that "[e]xpiration of a time limit at any

---

[62]  See Philadelphia Prisons Policies & Procedures, Policy 3.F.10, Doc. No. 89-1 at 2.

[63]  Policy 3.F.10 at 6-8.

[64]  Policy 3.F.10 at 7.

[65]  Policy 3.F.10 at 7-8.

[66]  Policy 3.F.10 at 3.

[67]  Pl.'s Br. in Opp'n to City Defs.' Mot. Summ. J. at 17.

stage of the process shall entitle the grievant to move to the next level of the process . . . ."[68]  If, at the expiration of the time in which the Warden is to render his decision on the initial grievance, no decision has been made, an inmate is entitled to file a level two appeal to the Commissioner.  Here, there is no evidence that Plaintiff appealed to the Commissioner when his initial grievances went unanswered.  Plaintiff's only attempt to exhaust was the initial filing of a grievance with respect to each incident; one on February 8, 2009, concerning his medical treatment, and the other on May 13, 2009, concerning the incident with Defendant Brown.  He did not follow through with his appeal and therefore did not exhaust his administrative remedies. Plaintiff's failure to exhaust bars his claims.

Since the Court has found that Plaintiff has failed to exhaust his administrative remedies it need not address the additional arguments advanced by Defendants in support of their Motions. However, the Court addresses the merits of Plaintiff's claims as they provide additional grounds for granting summary judgment in Defendants' favor.

**C.    Deliberate Indifference Claim Against Medical Defendants (Count I)**

To establish deliberate indifference to a serious medical need in violation of the Eighth Amendment to the United States Constitution, a plaintiff must develop a sufficient evidentiary basis from which a reasonable jury could conclude that defendants knowingly acted or failed to act in a manner that presented a substantial risk of harm.[69]  "Claims of negligence or medical malpractice, without some more culpable state of mind, do not constitute 'deliberate

---

[68]  Policy 3.F.10 at 3.

[69]  Farmer v. Brennan, 511 U.S. 825 (1994); Estelle v. Gamble, 429 U.S. 97, 102 (1976).

14

indifference.'"[70]  "Deliberate indifference requires a sufficiently culpable state of mind, such as 'reckless[ ] disregard[ ]' to a substantial risk of serious harm to a prisoner."[71]  The Third Circuit has found that deliberate indifference may be found where prison officials "1) deny reasonable requests for medical treatment, and the denial exposes the inmate to undue suffering or the threat of tangible residual injury, 2) delay necessary medical treatment for non-medical reasons, or 3) prevent an inmate from receiving recommended treatment for serious medical needs, or deny access to a physician capable of evaluating the need for treatment."[72]

Plaintiff relies on the third ground, but has failed to make a showing that Medical Defendants prevented him from receiving recommended medical treatment for serious medical needs or denied Plaintiff access to a physician capable of evaluating the need for treatment.  First, Plaintiff has not shown that Medical Defendants were unqualified to evaluate Plaintiff's need for treatment.  Further, Plaintiff has not shown that Medical Defendants failed to follow recommended discharge instructions or that adherence to the exact instructions was required.  While Plaintiff maintains that strict adherence to the discharge instructions was necessary and that the instructions were not followed, he has failed to provide support for this assertion.  Plaintiff's belief that the treatment was inadequate is unsupported by evidence of record and by itself, does not create a genuine issue for trial.

The evidence shows that Plaintiff met with medical staff on multiple occasions and that

---

[70]  Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999).

[71]  Whooten v. Bussanich, 248 F. App'x 324, 326 (3d Cir. 2007) (alteration in original).

[72]  Id. at 326-27.

he was given medicine for pain.  In fact, the record shows that Plaintiff's own refusal to submit to treatment, some of which was specifically prescribed by his discharge instructions, may have exacerbated his pain.  Plaintiff testified that although Dr. Caulk was willing and able to perform surgery to remove the fragments from Plaintiff's shoulder, Plaintiff refused treatment, stating that he wanted to be seen by a specialist or be sent to HUP for the surgery.[73]  While Plaintiff may have been unhappy that he was not provided the medical treatment he desired, a plaintiff does "not establish an Eighth Amendment violation merely by expressing disagreement with a medical defendant's choice of treatment."[74]  Additionally, while the Court recognizes that ignoring a prescription for treatment by a specialist may rise to a level of deliberate indifference, Plaintiff has failed to support with evidence his contention that the failure to refer him to a specialist did so here.[75]  He has failed to raise a genuine issue of fact for trial.

Finally, Plaintiff has not proffered any evidence that Medical Defendants' alleged deliberate indifference was the "but for" cause of his injury.  The bullet wound to Plaintiff's shoulder pre-dated his admittance into CFCF, and Plaintiff refused the recommended treatment of Medical Defendants including surgery and physical therapy.[76]  Without expert testimony or other evidence regarding the extent and cause of Plaintiff's injury, Plaintiff cannot establish that

---

[73]  Pl.'s Depo. 54-58.

[74]  Glenn v. Barua, 252 F. App'x 493, 497 (3d Cir. 2007) (citing Monmouth Cnty. Corr. Inst. Inmates v. Lanzaro, 834 F.2d 326, 346 (3d Cir. 1987)).

[75]  See Merritt v. Fogel, 349 F. App'x 742, 746 (3d Cir. 2009).

[76]  Plaintiff asserts that the refusal to submit to physical therapy is not relevant to the analysis because the therapy was prescribed after his confrontation with Sergeant Brown. In making this argument, Plaintiff illustrates the Court's point that Plaintiff's failure to produce evidence of the cause of his injuries prevents a reasonable fact finder from being able to conclude that either the deliberate indifference of Medical Defendants or the excessive force of Sergeant Brown caused his injury.

Medical Defendants' indifference to his medical needs caused the injury.[77]  This is particularly salient here where Plaintiff is alleging that both the deliberate indifference of Medical Defendants and the excessive force of Defendant Brown caused his pain.

Because Plaintiff has failed to establish that Medical Defendants were deliberately indifferent to a serious medical need, the Court finds that Medical Defendants are entitled to summary judgment in their favor.

**D.      Excessive Force Against Defendant Sergeant Brown (Count II)**

"The Eighth Amendment prohibits prison officials from unnecessarily and wantonly inflicting pain in a manner that offends contemporary standards of decency."[78]  Force applied "in a good faith effort to maintain or restore discipline," does not constitute an Eighth Amendment violation; force applied "maliciously and sadistically to cause harm," however, does.[79]  To determine whether the force applied was excessive, and therefore applied in violation of the Eighth Amendment, the Court considers several factors including "(1) the need for the application of force; (2) the relationship between the need and the amount of force that was used; (3) the extent of injury inflicted; (4) the extent of the threat to the safety of staff and inmates, as

---

[77]  Plaintiff maintains that "the consequences of not properly treating a recent reconstructive surgery is within the grasp of a lay man."   Even accepting this as true as a general proposition, this argument does not take into account that given the facts of this case, including Plaintiff's own refusal to submit to treatment, Plaintiff's assertion of multiple causes of injury (including gunshot, remaining fragments, confrontation with Sergeant Brown), expert testimony is likely necessary.  At the very least, Plaintiff is required to produce some evidence that Medical Defendants were not capable of performing this surgery, given Plaintiff's refusal to allow the surgery to be performed.

[78]  Freeman v. Dep't of Corrections, 447 F. App'x 385, 388 (3d Cir. 2011) (citing Hudson v. McMillian, 503 U.S. 1, 8 (1992)).

[79]  Id.

reasonably perceived by responsible officials on the basis of the facts known to them; and (5) any efforts made to temper the severity of a forceful response."[80]   "Not every malevolent touch by a prison guard gives rise to a federal cause of action.  The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort 'repugnant to the conscience of mankind.'"[81]

Plaintiff asserts that despite his "obvious injury," which according to Plaintiff was evident from the fact of his bottom bunk, bottom tier status, a status which he asserts prohibited the move, Defendant Brown forcibly removed him from his cell and pushed him up two flights of stairs.  He argues that this force was excessive in violation of the Eighth Amendment.  The Court disagrees.

First, Plaintiff has failed to come forth with sufficient evidence to show that Defendant Brown had knowledge of the existence or extent of Plaintiff's injury.  While it may have been reasonable for Brown to infer from Plaintiff's bunk status that Plaintiff had some physical limitation, the fact of his bunk status alone is insufficient to support a finding that Plaintiff's injury was "obvious" to Defendant Brown.  Plaintiff has not shown that Defendant Brown was aware that the type of force applied (pushing which caused Plaintiff's right shoulder to hit the railing and wall) was likely to cause harm.  Thus, this evidence does not support a finding that Defendant Brown applied the force to cause Plaintiff harm.

---

[80]   Id. (citing Whitley v. Albers, 475 U.S. 312, 321 (1986)).

[81]   Hudson v. McMillian, 503 U.S. 1, 9-10 (1992) (internal citation and quotation omitted) (Whitley v. Albers, 475 U.S. 312, 327 (1986)).

Furthermore, Plaintiff has not shown that the extent of the injury arising from the force applied warrants a finding that the force was excessive.  Plaintiff's medical records evidence only Plaintiff's subjective complaints about pain arising from the force.  The records do not show that Plaintiff had any abrasions or swelling, and noted only minimal tenderness of his shoulder without deformity.[82]  While the Court recognizes that the "*de minimis* injuries alone are not enough to justify a grant of summary judgment on an excessive force claim, in this instance they are indicative of the fact that the force utilized was also *de minimis*."[83]  The force Plaintiff alleges Defendant Brown applied here is the type of *de minimis* force which is excluded from the Eighth Amendment protection.[84]

Accordingly, the Court finds that Plaintiff's claim against Defendant Brown fails for the additional reason that a reasonable factfinder could not conclude that the force applied in this case was excessive.

**E.   Municipal Liability**

Not only is the Second Amended completely devoid of any claims asserted against the City or its predecessor Defendant in this case, the Philadelphia Prison System, but Plaintiff has failed to identify a single, specific prison policy that caused the constitutional violation here, and has failed to develop a sufficient evidentiary basis for a finding that the violation occurred

---

[82]   See Pl.'s Br. in Opp'n to City Defs.' Mot. Summ. J., Ex. C, Doc. No. 85-1 at 19-20.

[83]   Washam v. Klopotoski, 403 F. App'x 636, 640 (3d Cir. 2010).

[84]   Id.  The Court also notes that, as with Plaintiff's claims against Medical Defendants, due to a lack of medical evidence, Plaintiff has failed to establish the full extent of his injury and the degree of injury attributable to the multiple asserted causes.  In this case, where Plaintiff himself attributes his injury to multiple sources (gunshot wounds, lack of medical care, and excessive force), this delineation is important.

pursuant to City "custom" or was a result of the City's failure to develop and implement a specific policy.  Accordingly, even if the Court found that Plaintiff had exhausted his administrative remedies here or had raised an issue of fact as to exhaustion, there is an independent basis for granting summary judgment in favor of the City.

When a plaintiff seeks to hold a municipality liable for a constitutional deprivation, the plaintiff must establish that the alleged constitutional deprivation was a result of the municipality's official policy or custom.[85]  Municipal liability under § 1983 cannot be premised on a theory of *respondeat superior*; a municipality is not liable under § 1983 solely for employing a tortfeasor.[86]  "Official policy" typically refers to formal rules— "often but not always committed to writing—that are intended to, and do, establish fixed plans of action to be followed under similar circumstances consistently and over time."[87]  A course of conduct constitutes a "custom" when, though it has not "received approval though [a] body's decisionmaking channels," it is "so permanent and well settled" as to have the force of law.[88]

Here, Plaintiff has simply failed to produce evidence of the requisite "direct causal link between . . . a policy or custom and the alleged constitutional deprivations."[89]  Plaintiff appears to submit that the alleged constitutional violation by Medical Defendants occurred pursuant to

---

[85]  Caldwell v. Egg Harbor Police Dep't, 362 F. App'x 250, 251-52 (3d Cir. 2010).

[86]  Caldwell, 362 F. App'x at 251-52 (quoting Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978)).

[87]  Pembaur v. City of Cincinnati, 475 U.S. 469, 480-81 (1986).

[88]  Monell, 436 U.S. at 690-91; see also Jiminez v. All Maerican Rathskeller, Inc., 503 F.3d 247, 250 (3d Cir. 2007).

[89]  Regan v. Upper Darby Twp., 363 F. App'x 917, 922 (3d Cir. 2010) (quoting Sanford v. Stiles, 456 F.3d 298, 314 (3d Cir. 2006)).

City policy while the alleged constitutional policy by Defendant Brown occurred because of the absence of City policy.  With respect to the claims against Medical Defendants, Plaintiff argues that the City has a policy which prevents inmates from seeing specialists due to costs.[90]  The only evidence Plaintiff presents in support of this contention is Plaintiff's deposition testimony in which he states that Defendant Dr. Caulk stated that he could not see a specialist because of "something to do with the budget, funding, then transportation."[91]  Not only is this evidence insufficient to support a finding that such a policy existed, but from this statement it is unclear what the alleged policy provides.  Further, taking Plaintiff's testimony as true and without regard to the admissibility of this statement, a policy which takes into account funding and transportation is not necessarily unconstitutional.

With respect to the claims against Defendant Brown, Plaintiff argues that the City "did not establish procedures which would have allowed Defendant Brown to verify [Plaintiff's] bunk status prior to Defendant Brown's use of force against [Plaintiff]."[92]  Plaintiff has failed to produce any evidence of the existence, or lack thereof, of such a policy.  While the failure to promulgate a policy may support a finding of municipal liability, a plaintiff must prove that the failure to implement the policy was the "moving force" behind his injury.[93]  Plaintiff himself testified that Officer Ninan checked his bunk status before moving him.  This evidence not only supports an inference that there was a practice in place at the time by which officers checked an

---

[90]  Pl.'s Br. in Opp'n to City Defs.' Mot. Summ. J. at 7.

[91]  Pl.'s Depo. 55:1-14.

[92]  Pl.'s Br. in Opp'n to City Defs.' Mot. Summ. J. at 9.

[93]  See Bd. of Cnty Comm'rs of Bryan Cnty., 520 U.S. 397, 405 (1997).

inmate's bunk status before moving him, but more importantly belies Plaintiff's contention that he was subject to excessive force because of a lack of policy requiring that this very act be done.

Plaintiff has failed to establish municipal liability and Plaintiff's claims against the City fail for this additional reason.

### IV. Conclusion

For the foregoing reasons, the Motions will be granted.  An appropriate Order follows.